## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF OHIO
## WESTERN DIVISION AT DAYTON

MARK A. RAWLINGS,                    :

      Plaintiff,                   :
                                                    Case No. 3:14cv00159
 vs.                                  :
                                                    District Judge Thomas M. Rose
CAROLYN W. COLVIN,                   :      Chief Magistrate Judge Sharon L. Ovington
Acting Commissioner of the Social
Security Administration,             :

      Defendant.                   :

---

## REPORT AND RECOMMENDATIONS[1]

---

## I.    Introduction

Plaintiff Mark A. Rawlings brings this case challenging the Social Security

Administration's denial of his applications for Disability Insurance Benefits and

Supplemental Security Income.  He asserts here, as he did before the administration, that

he has been under a benefits-qualifying disability – starting in January 2011 – due to his

debilitating health problems, including cardiovascular disease and back pain, among

others.

The case is presently before the Court upon Plaintiff's Statement of Errors (Doc.

#6), the Commissioner's Memorandum in Opposition (Doc. #8), the administrative record

---

[1] Attached hereto is NOTICE to the parties regarding objections to this Report and
Recommendations.

(Doc. #5), and the record as a whole.

## II.     Background

### A.     Plaintiff's Vocational Profile and Testimony

On the date Plaintiff asserts that his disability began, his age placed him the Social Security Administration's category for a younger person.  He graduated from high school and worked over the ensuing years as a group leader, a production assembler, a lumberyard worker, and a delivery truck driver.

During a hearing held by Administrative Law Judge Amelia G. Lombardo, Plaintiff stated that he is 6 feet 1 inch tall and weighs 365 pounds.  He is married and has 2 sons and 2 stepchildren.

Plaintiff testified that he can no longer work due to back pain from a previous spinal injury – a ruptured disc at L5/S1.  His back pain was aggravated by the significant weight gain caused by medications.  He did not undergo back surgery but did have epidural injections plus physical therapy.  He explained, "Due to my age, they wanted to wait on the surgery and then do the therapy and everything, and weight loss.  I was able to get to where it was maintainable without the surgery."  (Doc. #5, *PageID* # 66).  He takes pain medication for his back pain.  These help very slightly.  He does not increase the dosages of pain medications due to the addictive nature of the medication.  He describes the pain as "continuously constant."  *Id*. at 69.  In addition to weight gain, certain medications cause him to become drowsy.  He cannot walk one block without

2

experiencing pain in his lower back radiating into his left leg, to his knee. Standing causes him pain after about 10 minutes. Sitting causes him pain after 5 to 10 minutes. He testified that when pain begins, "I've got to fidget and adjust and shift weight from one side to the other or stand." (Doc. #5, *PageID* # 70). He can lift very little – maybe 5 pounds, if needed.

In 2011, Plaintiff was diagnosed with heart problems and put on sick leave from work. Until this occurred, he had been working 12 to 16 hours a day, sometimes up to 7 days a week. His heart problems cause him to have "constant shortness of breath, lightheadedness, extreme sweating. Any exertion whatsoever causes tunnel vision, occasional fainting, chest pains." *Id*. at 67. He had surgery to implant an ICD (an implantable cardioverter defibrillator), which has never "gone off."[2] *Id*. He attempts to use a treadmill at home, but he finds it difficult to get on it when he is alone. Within 1 or 2 minutes of using the treadmill he starts sweating profusely and gets extremely lightheaded and has tunnel vision. He smokes about 1 cigarette every couple days and was trying to quit at the time of the ALJ's hearing.

Plaintiff does not do household chores because "it usually causes quite a bit of pain ...." *Id*. at 71. He spends his time watching television, getting on the computer, or attempting to exercise on the treadmill. He can dress and groom himself. He needs to lie

---

[2] "ICDs are useful in preventing sudden death in patients with known, sustained ventricular tachycardia or fibrillation.... Studies have shown ICDs to have a role in preventing cardiac arrest in high-risk patients who haven't had, but are at risk for, life-threatening ventricular arrhythmias." American Heart Association, http://heart.org/HEARTORG (search for "ICD").

down during the day to cope with his pain.  He also changes position to alleviate his pain

without taking narcotic pain medication.  For example, he uses a recliner or stands and

walks back and forth.  He estimates that he uses the recliner a couple hours each day.  He

elevates his legs when he reclines.

### B.    Medical Records And Opinions

A detailed description of the evidence is unnecessary because the undersigned has

reviewed the entire administrative record and because both the ALJ and Plaintiff's counsel

have discussed the relevant records concerning Plaintiff's physical and mental

impairments with citations to specific evidence.  The Commissioner defers to the factual

recitations in the ALJ's decision.

### III.    "Disability" Defined and  ALJ Lombardo's Decision

To be eligible for Disability Insurance Benefits or Supplemental Security Income a

claimant must be under a "disability" as the term is defined by the Social Security Act.

*See* 42 U.S.C. §§423(a), (d), 1382c(a).  The definition of the term "disability" is essentially

the same for both benefit programs.  *See Bowen v. City of New York*, 476 U.S. 467, 469-70

(1986).  Narrowed to its statutory meaning, a "disability" includes only physical or mental

impairments that are both "medically determinable" and severe enough to prevent the

applicant from (1) performing his or her past job and (2) engaging in "substantial gainful

activity" that is available in the regional or national economies.  *See Bowen*, 476 U.S. at

469-70.

4

As noted previously, it fell to ALJ Lombardo to evaluate the evidence connected to Plaintiff's benefit applications.  She did so by considering each of the 5 sequential steps set forth in the Social Security regulations.  *See* 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4).[3] Her findings a steps 1 through 3 were not dispositive and  required her to reach step 4.

At step 4, ALJ Lombardo assessed Plaintiff's residual functional capacity or the most he could do despite his impairments.  *See* 20 C.F.R. §404.1545(a); *see also Howard v. Commissioner of Social Sec.*, 276 F.3d 235, 239 (6th Cir. 2002).  The ALJ concluded that Plaintiff could perform the full range of sedentary work but could no longer perform his past relevant work.

At step 5, the ALJ found that, in light of Plaintiff's age, education, and work experience, ability to perform the full range of sedentary work, Medical-Vocational Rule 201.28 directs a finding of "not disabled."  (Doc. #5, PageID# 44).  This ended the ALJ's evaluation.

## IV.    <u>Judicial Review</u>

The Social Security Administration's denial of Plaintiff's applications for benefits – here, embodied in ALJ Lombardo's decision – is subject to judicial review along two lines: whether the ALJ applied the correct legal standards and whether substantial evidence supports the ALJ's findings.  *Blakley v. Comm'r of Social Sec.*, 581 F.3d 399,

---

[3] The remaining citations to the regulations will identify the pertinent Disability Insurance Benefits regulations with full knowledge of the corresponding Supplemental Security Income regulation.

405 (6th Cir. 2009); *see Bowen v. Comm'r of Social Sec.*, 478 F3d 742, 745-46 (6th Cir. 2007). Reviewing the ALJ's legal criteria for correctness may result in reversal even if the record contains substantial evidence supporting her factual findings. *Rabbers v. Comm'r of Social Sec.*, 582 F.3d 647, 651 (6th Cir. 2009); *see Bowen*, 478 F3d at 746.

The substantial-evidence review does not ask whether the Court agrees or disagrees with the ALJ's factual findings or whether the administrative record contains evidence contrary to those factual findings. *Rogers v. Comm'r of Social Sec.*, 486 F.3d 234, 241 (6th Cir. 2007); *see Her v. Comm'r of Social. Sec.*, 203 F.3d 388, 389-90 (6th Cir. 1999). Instead, substantial evidence supports the ALJ's factual findings when "a 'reasonable mind might accept the relevant evidence as adequate to support a conclusion.'" *Blakley*, 581 F.3d at 406 (quoting *Warner v. Comm'r of Social Sec.*, 375 F.3d 387, 390 (6th Cir. 2004)). Substantial evidence consists of "more than a scintilla of evidence but less than a preponderance..." *Rogers*, 486 F.3d at 241.

## V.    Discussion

### A.    Medical Source Opinions

Plaintiff contends that the ALJ erred "when she split the difference" between the record-reviewing physicians' opinions (who believed he could do light work) and the opinions provided by treating physicians Dr. Busch and Adib (who believed that Plaintiff could not work). Plaintiff also argues that the ALJ erred as a matter of law by not first evaluating his treating physicians' opinions under the required legal standards. And

6

Plaintiff maintains that the ALJ failed to provide "good reasons" for rejecting the opinions of his treating physicians.

The Commissioner argues that the ALJ reasonably weighed the medical source opinions and provided good reasons for not crediting the disability opinions of his treating physicians or the record-reviewers' opinions.

Social security regulations recognize several different types of medical sources: treating physicians, nontreating yet examining physicians, and nontreating/record-reviewing physicians. *Gayheart v. Comm'r Social Sec.*, 710 F.3d 365, 375 (6th Cir. 2013).

> As a general matter, an opinion from a medical source who has examined a claimant is given more weight than that from a source who has not performed an examination (a "nonexamining source"), and an opinion from a medical source who regularly treats the claimant (a "treating source") is afforded more weight than that from a source who has examined the claimant but does not have an ongoing treatment relationship (a "nontreating source"). In other words, "[t]he regulations provide progressively more rigorous tests for weighing opinions as the ties between the source of the opinion and the individual become weaker." Soc. Sec. Rul. No. 96–6p, 1996 WL 374180, at *2 (Soc. Sec. Admin. July 2, 1996).

*Gayheart*, 710 F.3d at 375 (citing, in part, 20 C.F.R. §§ 404.1527(c)(1) and (2) (eff. April 1, 2012)).[4] To effect this hierarchy, the Regulations adopt the treating physician rule. *See Gayheart*, 710 F.3d at 375; *see also Rogers*, 486 F.3d at 242; *cf. Bauer v. Astrue*, 532 F.3d 606, 608 (7th Cir. 2008) ("in fact the technical name for the 'treating physician' rule is the

---

[4] The Social Security Administration has re-lettered 20 C.F.R. §404.1527 without altering the treating physician rule or other legal standards. *See Gentry v. Comm'r of Soc. Sec.*, 741 F.3d 708, 723 6th Cir. 2014). The re-lettered version applies to decisions, like ALJ Lombardo's decision, issued on or after April 1, 2012.

'treating source' rule").  The rule is straightforward:

> Treating-source opinions must be given "controlling weight" if two conditions are met: (1) the opinion is "well supported by medically acceptable clinical and laboratory diagnostic techniques" and (2) the opinion "is not inconsistent with other substantial evidence in [a claimant's] case record."

*Gayheart*, 710 F.3d  at 376 (quoting 20 C.F.R. §404.1527(c)(2)); *see Gentry*, 741 F.3d at

723.  If both conditions do not exist, the ALJ's review must continue:

> When the treating physician's opinion is not controlling, the ALJ, in determining how much weight is appropriate, must consider a host of factors, including the length, frequency, nature, and extent of the treatment relationship; the supportability and consistency of the physician's conclusions; the specialization of the physician; and any other relevant factors.

*Rogers*, 486 F.3d at 242 (citing *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir.

2004).

As to non-treating medical sources, the regulations require ALJs to weigh their

opinions "based on the examining relationship (or lack thereof), specialization,

consistency, and supportability, but only if a treating-source opinion is not deemed

controlling."  *Gayheart*, 710 F.3d  at 376 (citing 20 C.F.R. §404.1527(c)).

In Plaintiff's administrative case, ALJ Lombardo recognized that in January 2013,

Dr. Busch stated that Plaintiff was disabled for any gainful employment.  The ALJ gave no

controlling or deferential weight to Dr. Busch's disability opinion.  Her first reason was

that the question "is reserved for the Commissioner."  (Doc. 35, *PageID* # 42).  While it

was the ALJ's duty to resolve the ultimate issue of whether Plaintiff met the statutory

8

definition of a "disability," *see* 20 C.F.R. §404.1527(d)(1), this was not a valid reason for discounting Dr. Busch's opinions. "The pertinent regulation says that 'a statement by a medical source that you are 'disabled' or 'unable to work' does not mean that we will determine that you are disabled.' 20 C.F.R. § 404.1527(e)(1). That's not the same thing as saying, that such a statement is improper and therefore to be ignored ...." *Bjornson v. Astrue*, 671 F.3d 640, 647 (7th Cir. 2012). Additionally, the regulation that specifies the factors applicable to weighing medical source opinions provides no support for the ALJ's reliance on the fact that Dr. Busch expressed a disability opinion as a legitimate ground for discounting his opinions. *See* 20 C.F.R. § 404.1527(c).

Next, the ALJ rejected Dr. Busch's opinion because "[m]ost of the claims made in his letter are the allegations from the claimant, as his clinical exams of the claimant have been stable and asymptomatic." (Doc. #5, *PageID#* 42). Substantial evidence fails to back up these reasons. Dr. Busch's January 2013 letter indicates that he had treated Plaintiff for 2 years. Dr. Busch explained that Plaintiff's electrocardiogram "showed an intraventricular conduction delay with nondiagnostic ST-T changes." *Id*. at 548. Dr. Busch continued:

> [Plaintiff] went on to stress testing, which revealed a dilated and hypokinetic left ventricle with an ejection fraction of approximately 30%. A 2-dimensional echo confirmed these findings. He went on to cardiac catheterization studies, which revealed normal coronaries and again confirmed left ventricular systolic function with an ejection fraction of approximately 25%. He was begun on a medical program including aspirin, ACE inhibitor therapy at 30 mg a day, Coreg 9.375 twice daily, Lasix daily, as well as [S]otalol 160 mg twice a day. He went on to ICD implantation on

> June 8, 2011, and at that time he was noted to be in atrial fibrillation, which prompted the initiation of the sotalol therapy.

*Id*. It is not reasonable to conclude from this explanation, given its high-level of substantive detail and references to objective findings, that Dr. Busch had only the "allegations from the claimant" when he provided his opinion. Substantial evidence therefore fails to support this reason provided by the ALJ for rejecting Dr. Busch's opinion.

The ALJ's next finding that Plaintiff's clinical exams have been "stable and asymptomatic" – without some further explanation by the ALJ – fails to support her rejection of Dr. Busch's opinion. Whatever level of stability Plaintiff and his physicians have obtained, exams sometimes revealed cardiovascular symptoms. On July 13, 2012, Dr. Ahmad noted that Plaintiff's pulse was 43 beats per minute and irregular with ventricular entropy ...." *Id*. at 501. His cardiovascular "was notable for distant, occasionally irregular heart sounds ...." *Id*. Although most of Plaintiff's clinical exams were asymptomatic concerning his cardiovascular functioning, this occurred after surgeons implanted Plaintiff's ICD. His lack of symptoms is therefore credited to the serious ongoing medical treatment he has received – or, as Dr. Busch characterizes it, "continued aggressive medical therapy." *Id*. at 548. There is no dispute in the record that Plaintiff still suffers from severe dilated cardiomyopathy, atrial fibrillation, ventricular ectopy, and morbid obesity. *See id*. As Dr. Busch recognized, he is still "status post ICD implantation." *Id*. at 548. Given these undisputed serious medical conditions, and

10

Plaintiff's ongoing need for continued aggressive medical therapy after his ICD was surgically implanted, it was an unreasonable inferential leap for the ALJ to conclude that Plaintiff's currently stable, asymptomatic condition failed to support Dr. Busch's opinions.

The ALJ next rejected Dr. Busch's opinions by explaining, Plaintiff's "ejection fraction is up since he started treatment." (Doc. #5, *PageID*# 42). Before the ICD implant, Plaintiff's ejection fraction was approximately 25% and 30%. *Id*. at 466. After the ICD implant, it was estimated at 30-35%. While this is an arguably slight increase, it remains consistent with Dr. Busch's diagnosis of cardiomyopathy and is still below 40 and, therefore, may constitute evidence of heart failure. American Heart Association, http://heart.org/HEARTORG (search for "ejection fraction"). And, the fact that these are approximate and estimated values, the small increase suggests a minimally improved ejection fraction. Neither the ALJ nor the Commissioner point to evidence in the record to support a more significant increase in Plaintiff's estimated ejection fraction. Substantial evidence therefore fails to support the increased ejection fraction as a reason rejecting Dr. Busch's opinions.

Turning to Exhibit 13F, *PageID*#s 486-93, the ALJ states, "Dr. Busch is unable to give an opinion as to the claimant's condition." *Id*. at 42. This appears in an undated form Dr. Busch completed in which he also indicated that Plaintiff was not a malingerer, he had "marked limitations in his physical activities ...," and his cardiac symptoms were frequently "severe enough to interfere with his attention and concentration needed to

11

perform even simple tasks." *Id*. at 486.  Because Dr. Busch provided some information in this form about Plaintiff's condition and work limitations, it was error for the ALJ to focus solely on Dr. Busch's note indicating he could not provide an opinion about Plaintiff's other work abilities or limitations.  *See Brooks v. Comm'r of Soc. Sec*., 531 F. App'x 636, 641 (6th Cir. 2013) ("substantiality of evidence must take into account whatever in the record fairly detracts from its weight.") quoting *Garner v. Heckler*, 745 F.2d 383, 388 (6th Cir. 1984)); *see also Loza v. Apfel*, 219 F.3d 378, 393 (5th Cir. 2000)("ALJ must consider all the record evidence and cannot 'pick and choose' only the evidence that supports his position.").  In addition, there remains the strong likelihood that Dr. Busch completed this undated form near the beginning of his time treating Plaintiff.  If so, Dr. Busch's inability to provide a more detailed picture of Plaintiff's work abilities and limits does not conflict with his later disability opinion.

The ALJ also rejected Dr. Busch's opinion because Dr. Busch "was unsure at one point whether the claimant's condition was serious enough to warrant a defibrillator implant."  (Doc. #5, *PageID#* at 42).  This misreads or mischaracterizes Dr. Busch's notes. In May 2011, before Plaintiff's ICD was implanted, Dr. Busch wrote, "The plan now is to admit [Plaintiff] for placement of an ICD, possible biventricular pacer.  I am not sure that he meets the criteria." *Id*. at 356.  This is ambiguous.  Dr. Busch is talking here about two different medical devices.[5]  An ICD or an ICD with biventricular pacing capability.  *See id*.

---

[5] For an explanation of the differences between an ICD and a biventricular pacer, see http://hokinsmedicine.org/healthlibrary (search for: "biventricular pacemakers ICD").

at 498.  Consequently, his reference to both without more could reasonably mean he was uncertain about the ICD implant or about the need to implant an ICD with biventricular-pacing capability.  Dr. Busch's use of the word "possible" before "biventricular pacer" suggests that he was uncertain only about whether implanting an ICD with biventricular-pacing capability would be warranted.  Regardless, once surgeons implanted an ICD with biventricular-pacing capability, Dr. Busch's previous uncertainty became irrelevant in the face of the medical evidence as it developed during surgery and, for that matter, as it continued to develop thereafter.  The surgical and post-ICD-implant evidence explains why Dr. Busch formed his later disability opinion and provides a logical reason why he lost any pre-implant uncertainty he held about Plaintiff's cardiac condition.  It was not as if Dr. Busch changed his opinion in an effort to help Plaintiff obtain disability benefits.  There is no evidence that he did so.  Instead, the surgery and post-implant evidence explains why he was uncertain before surgery and certain after surgery.  It was therefore unreasonable for the ALJ to characterize Dr. Busch's opinions as inconsistent.

The ALJ lastly rejected Dr. Busch's opinion that Plaintiff's cardiac condition was within class III of the New York Heart Association's (NYHA's) system.  The ALJ reasoned that Dr. Busch's class-III opinion "is inconsistent with the NYHA classification of another cardiologist who did approve the implant.  Dr. [sic] Even if this classification was accurate, it is not inconsistent with the above [sedentary] residual functional capacity or the claimant's reported activities of daily living."  (Doc. #5, *PageID* # 42).  Here in her

decision, the ALJ did not identify the other cardiologist she referred to.  *See id*.  Earlier in her decision, she noted that Dr. Ahmad referred to Plaintiff's NYHA classification at II.  (Doc. #5, *PageID*#s 42 (citing Exhibit 5F, page 7, *PageID*# 343)).  A close reading of Dr. Ahmad's note reveals that before surgery, Plaintiff's symptoms fell in NYHA class II.  *Id*., *PageID*# 343.  Dr. Ahmad writes, "The patient was admitted to Kettering Medical Center on June 8, 2011 for implant of a dual-chamber ICD and leads.  He has a history of dilated cardiomyopathy with an ejection fraction of 30% and NYHA stage II symptoms...."  *Id*.  It does not appear that Dr. Ahmad assessed Plaintiff in the NYHA classification system after his surgery, when more surgical and medical evidence came to light.  Additionally, on the day of Plaintiff's ICD implant, cardiologist Dr. Saleem, who performed the surgery, noted that Plaintiff's surgery was needed for many reasons including that Plaintiff was in NYHA class III.  *Id*. at 349.  The ALJ did not consider this evidence – which is the same as and consistent with Dr. Busch's opinion that Plaintiff's symptoms fall into NYHA class III – when assessing whether Dr. Busch's opinion was inconsistent with other medical opinions.  This was error.  *See Brooks*, 531 F. App'x at 641 ("substantiality of evidence must take into account whatever in the record fairly detracts from its weight." (citation omitted)); *see also Loza*, 219 F.3d at 393. Additionally, NYHA class III denotes a person with "[m]arked limitation of physical activity.  Comfortable at rest.  Less than ordinary activity causes fatigue, palpitation, dyspnea."  American Heart Association, http://heart.org/HEARTORG (search for "New York Heart Association Classification").  It is far from clear that a person

14

falling within NYHA class III can perform sedentary work, as the ALJ concluded, because even "less than ordinary activity causes ..." a person in class III to experience fatigue, palpitation, and/or dyspnea. *Id*. The last symptom, "dyspnea" – or "[a]ir hunger resulting in labored or difficult breathing, sometimes accompanied by pain"[6] – would likely present an insurmountable limitation on a person's ability to perform sedentary work. And, together or alone, these 3 symptoms make it highly unlikely that a person in NYHA class III could perform the full range of sedentary work for 8 hours a day, 5 days a week. Even if, generally speaking, some such applicants can perform sedentary work, Plaintiff could cannot, as will be discussed next.

Accordingly, substantial evidence fails to support the ALJ's rejection of Dr. Busch's opinions.

### B.   Plaintiff's Credibility

Plaintiff argues that the ALJ erred in evaluating his credibility because she did not consider the medications he must take and their side effects. Plaintiff maintains that the objective medical findings support his testimony. The ALJ also erred, according to Plaintiff, by relying on his daily activities to support the conclusion that he could do sedentary work. Plaintiff asserts that his daily activities are isolated, are done when he can proceed at his own pace, and do not show any ability to sustain a 40-hour workweek.

The Commissioner maintains that the ALJ's reasonable credibility findings are

---

[6] Taber's Cyclopedic Medical Dictionary at 627 (19th Ed. 2001).

15

supported by her explanation and, consequently, are entitled to great deference.

"[A]n ALJ's findings based on the credibility of the applicant are to be accorded great weight and deference, particularly since an ALJ is charged with the duty of observing a witness's demeanor and credibility." *Walters v. Comm'r of Soc. Sec*., 127 F.3d 525, 531 (6th Cir. 1997). "It is of course for the ALJ, and not the reviewing court, to evaluate the credibility of witnesses, including that of the claimant. However, the ALJ is not free to make credibility determinations based solely upon an "intangible or intuitive notion about an individual's credibility." *Rogers v. Comm'r of Soc. Sec.,* 486 F.3d 234, 247 (6th Cir. 2007) (internal citations omitted). Substantial evidence must support the ALJ's reasons for discounting the applicant's statements. *See id*. at 248-49. In addition, Social Security Ruling 96-7p, 1996 WL 374186 at *4 (July 2, 1996), instructs ALJs to "consider the entire record and give specific reasons for the weight given to the individual's statements." And, the ALJ's "reasons for the credibility finding must be grounded in the evidence and articulated in the determination or decision...." *Id*.

ALJs tasked with addressing a claimant's credibility first determine "whether there is objective medical evidence of an underlying medical condition." *Felisky v. Bowen*, 35 F.3d 1027, 1038 (6th Cir. 1994) (Citation omitted); *see* 20 C.F.R. § 404.1529(b). If such objective medical evidence exists, then ALJs consider two alternative questions:

1. Whether objective medical evidence confirms the severity of the alleged pain arising from the condition; or

2. Whether the objectively established medical condition is of such a severity

that it can reasonably be expected to produce the alleged disabling pain. *Felisky*, 35 F.3d at 1038-39 (citation omitted); *see* 20 C.F.R. §404.1529(c).  The regulations set forth many factors, a "checklist of factors" according to *Felisky*, 35 F.3d at 1039, applicable to evaluating a person's symptoms, including, for instance, the person's daily activities and medication side effects.  *Id*.

ALJ Lombardo's decision relies heavily on Plaintiff's daily activities – his "wide range of daily activities" (Doc. #5, *PageID* # 41) as she views them – to support her conclusion that Plaintiff's statements are "not entirely credible."  *Id*. at 40.  The ALJ follows this with a list of activities Plaintiff described to an examining psychologist.  But, the ALJ does not indicate which of these activities – either alone or together – conflicted with Plaintiff's testimony such that he was not entirely credible.  Instead, after listing these activities, the ALJ concluded, "While these activities of daily living indicate some level of limitation, they do not suggest the he could not do at least sedentary work."  *Id*.  Before reaching this conclusion, the ALJ recognized that Plaintiff told the examining psychologist (in the ALJ's words), "it is hard for him to do anything because he frequently gets out of breath and feels like he is going to pass out."  *Id*.  This limitation fails to support the ALJ's conclusion that Plaintiff's daily activities "do not suggest that he could not do at least sedentary work."  *Id*.  Instead, this limitation is inconsistent with sedentary work, which requires a person to be able to stand and walk up to about 2 hours and sit up to 6 hours during an 8-hour workday.  *See* Soc. Sec. R. 96-9P, 1996 WL 374185 at *6 (1996).

17

Furthermore, the list of activities Plaintiff provided to the psychologist does not describe how long or how frequently (in a given day) he engages in the daily activities he mentions. (Doc. #5, *PageID*# 382). Thus, without such further information in the list, it cannot be fairly read as inconsistent with his testimony. The ALJ, moreover, failed to consider information in the psychologist's report tending to support Plaintiff's credibility. The psychologist observed that Plaintiff "did not exaggerate or minimize his report of his problems. His statements seemed consistent. He is considered a reliable informant." (Doc. #5, *PageID*# 383). This, moreover, confirms Dr. Busch's opinion that Plaintiff is not a malingerer. *Id*. at 486.

The ALJ also relies on Plaintiff's mother's report concerning Plaintiff's daily activities to find, "these activities are not representative of someone who is disabled and show that he can do at least sedentary exertion work." *Id*. at 40. This is not a fair reading of the reports Plaintiff's mother provided. The activities she mentions are minimal (e.g., driving, tv watching, reading) and are tempered by her other comments. She stated that Plaintiff has trouble breathing, irregular heartbeats, and extreme fatigue. *Id*. at 216. He wakes up short of breath, and the meals he prepares involve only sandwiches or frozen dinners (and this takes him ½ hour). *Id*. at 217-18. His ability to socialize daily says nothing probative about his physical work abilities or credibility. In brief note, Plaintiff's mother stated that he "is unable to work due to his medical condition and advice from his doctors." *Id*. at 290. This is consistent with Plaintiff's testimony and is counter to the

18

ALJ's conclusion that his mother's report supports the finding that Plaintiff can do sedentary work.

The ALJ appears to discredit Plaintiff because he testified that weight gain was due to medication but inconsistently reported during a January 2013 medical exam that his weight gain was caused by his snacking and poor diet choices. *Id*. at 41. The ALJ failed to realize that these reasons do not conflict. If Plaintiff's medications caused him to gain weight, as he testified, they logically caused his appetite to increase to the point he was snacking and making poor diet choices, as he stated during the medical exam. At least one medication Plaintiff takes for his cardiac problems - Coreg (Carvedilol) – causes "extreme hunger." http://www.nlm.nih.gov/medlineplus/druginformation.html (search for "Carvedilol").

Alternatively, setting these problems aside, for the moment, the ALJ used problematic, at least in some cases, boilerplate language to summarize her credibility findings. She wrote:

> After careful consideration of the evidence, the undersigned finds that the claimant's medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely credible for the reasons explained in this decision.

(Doc. #5, *PageID*# 40). This boilerplate language has been strongly criticized: "It is not only boilerplate; it is meaningless boilerplate. The statement by trier of act that a witness's testimony is 'not *entirely* credible' yields no clue to what weight the trier of fact gave the

testimony." *Parker v. Astrue*, 597 F.3d 920, 921 (7th Cir. 2010) (italics in *Parker*). Another criticism: "if the plaintiff's '*medically determinable* impairments could reasonably be expected to cause the alleged symptoms' (emphasis added), why is the plaintiff's credibility important?" *Goins v. Colvin*, 764 F.3d 677, 681 (7th Cir. 2014). This is a great question. There is no dispute in the present case that Plaintiff's severe cardiac problems led surgeons to implant in Plaintiff's chest an ICD with biventricular capabilities. There is likewise no dispute that he is morbidly obese and that his present cardiac condition requires ongoing "aggressive medical therapy." (Doc. #5, *PageID#* 548). His reported symptoms are consistent with these medically determinable impairments, as even the ALJ recognized. *Id.* at 40. As in *Goins*, these aspects of the record and the ALJ's decision provide "an additional reason to doubt the validity of her denial of benefits." *Goins*, 764 F.3d at 681.

In sum, without considering the alternative problems with the ALJ's decision just discussed in the immediately preceding paragraph, and although social security ALJs' credibility decisions are generally due great weight and deference, *see Walters*, 127 F.3d at 531, substantial evidence fails to support the ALJ's reasons for "not entirely" crediting Plaintiff's testimony. Plaintiff's challenges to the ALJ's credibility decision are therefore well taken.

## VI.    **Remand For Benefits**

Remand is warranted when an ALJ's decision is unsupported by substantial evidence or when the ALJ failed to follow the Administration's own regulations and that

shortcoming prejudiced the plaintiff on the merits or deprived the plaintiff of a substantial

right.  *Bowen*, 478 F3d at 746.  Remand for an ALJ's failure to follow the regulations might

arise, for example, when the ALJ failed to provide "good reasons" for rejecting a treating

medical source's opinions, *see Wilson*, 378 F.3d at 545-47; failed to consider certain

evidence, such as a treating source's opinions, *see Bowen*, 478 F3d at 747-50; failed to

consider the combined effect of the plaintiff's impairments, *see Gentry*, 741 F.3d at 725-26;

or failed to provide specific reasons supported by substantial evidence for finding the

plaintiff's credibility lacking, *Rogers*, 486 F.3d at 249.

      Under sentence 4 of 42 U.S.C. §405(g), the Court has authority to affirm, modify, or

reverse the Commissioner's decision "with or without remanding the cause for rehearing."

*Melkonyan v. Sullivan*, 501 U.S. 89, 99 (1991).  Consequently, a remand under sentence 4

may result in the need for further proceedings or an immediate award of benefits.  *E.g.,*

*Blakley*, 581 F.3d at 410; *Felisky*, 35 F.3d at 1041.  The latter is warranted where the

evidence of disability is either overwhelming or strong while contrary evidence is weak.

*Faucher v. Sec'y of Health & Humans Servs.*, 17 F.3d 171, 176 (6th Cir. 1994).

      A remand for an award of benefits is warranted in the present case because the

evidence of disability is either overwhelming or strong while contrary evidence is weak.

The overwhelming or strong evidence consists of Plaintiff's undisputed severe cardiac

problems – namely, cardiomyopathy, his status of being post-ICD implantation, his need for

ongoing aggressive medical therapy, and his history of atrial fibrillation.  These problems,

moreover, tend to confirm his credibility especially when they are considered in combination with his morbid obesity, which is caused in large part by his need for prescription medication that increases his appetite.  Plaintiff, moreover, has been assessed with a body mass index (BMI) of 40.  This is within Level III, the Social Security Administration's highest level of obesity.  *See Shilo v. Comm'r of Soc. Sec.*, 600 F. App'x 956, 959 (6th Cir. 2015) (discussing Soc. Sec. R. 02-1P, 2002 WL 34686281).  Other strong evidence tends to confirm his credibility, most prominently the examining psychologist's conclusion that Plaintiff is a reliable informant and Dr. Busch's indication that Plaintiff is not a malingerer.  No medical source of record explicitly disagreed with their credibility assessments.  For these reasons, the evidence related to Plaintiff's credibility when viewed in combination, is either overwhelming or strong while contrary evidence is weak, if not absent from the record.

Lastly, in light of the problems with the ALJ's evaluation of Dr. Busch's opinion and Plaintiff's credibility, the ALJ's finding that Plaintiff was capable of performing the full range of sedentary work is flawed and unsupported by substantial evidence.  This, in turn, means that the ALJ's reliance on Vocational Rule 201.28 to find Plaintiff not disabled was misplaced because this Rule applies to claimant who, unlike Plaintiff, can perform the full range of sedentary work.  The ALJ, moreover, did not question the vocational expert about whether hypothetical person with Plaintiff's work abilities could perform a significant number of jobs available in the national economy.  Under questioning by Plaintiff's

22

counsel, the vocational expert testified that, accepting Plaintiff's need to rest in a recliner for 2 hours a day, he would not be able to do any work on a sustained basis.  (Doc. #5, *PageID*# 76).  Because the evidence supporting Plaintiff's testimony was either overwhelming or strong while contrary evidence is weak, the vocational expert's testimony establishes that Plaintiff was under a benefits-qualifying disability.

## IT IS THEREFORE RECOMMENDED THAT:

1. The Commissioner's non-disability decision dated March 29, 2013, be VACATED;

2. Plaintiff Mark Rawlings's applications for Disability Insurance Benefits and Supplemental Security Income be REMANDED to the Social Security Administration under Sentence 4 of 42 U.S.C. §405(g) for payment of benefits consistent with a Decision adopting this Report and Recommendations and with the Social Security Act; and

3. The case be terminated on the Court's docket.

June 30, 2015

s/Sharon L. Ovington
Sharon L. Ovington
Chief United States Magistrate Judge

23

## NOTICE REGARDING OBJECTIONS

Pursuant to Fed. R. Civ. P. 72(b), any party may serve and file specific, written objections to the proposed findings and recommendations within **FOURTEEN** days after being served with this Report and Recommendations.  Pursuant to Fed. R. Civ. P. 6(d), this period is extended to **SEVENTEEN** days because this Report is being served by one of the methods of service listed in Fed. R. Civ. P. 5(b)(2)(C), (D), (E), or (F).  Such objections shall specify the portions of the Report objected to and shall be accompanied by a memorandum of law in support of the objections.  If the Report and Recommendation is based in whole or in part upon matters occurring of record at an oral hearing, the objecting party shall promptly arrange for the transcription of the record, or such portions of it as all parties may agree upon or the Magistrate Judge deems sufficient, unless the assigned District Judge otherwise directs.  A party may respond to another party's objections within **FOURTEEN** days after being served with a copy thereof.

Failure to make objections in accordance with this procedure may forfeit rights on appeal.  *See Thomas v. Arn,* 474 U.S. 140 (1985); *United States v. Walters,* 638 F.2d 947, 949-50 (6th Cir. 1981).